Good morning, Your Honor. Thank you. Laura Doherty, appearing for the appellants Howard Jarvis Taxpayers Association, Debra DeRoger and Jonathan Capal, and I would like to reserve five minutes. I have three points I'd like to make today as we discuss whether the CalSAVERS program is preempted by federal law, the federal law ERISA. So how does ERISA supersede the CalSAVERS statutes? The three points I'll focus on today are that, number one, congressional intent has been clear from 1974 through to 2017 that this is federal territory. This is retirement savings and this is federal territory. ERISA even preempts some areas of traditional state regulation, but this is completely federal. Number two, our context here is retirement savings in employment relationships. This is distinct from health care cases. And lastly, I'd like to focus on the fact that employer autonomy in ERISA must supersede the CalSAVERS mandate. The employers cannot be mandated. So as to my first point, the easiest way to see preemption in this case is to look to the May 2017 Act of Law forbidding CalSAVERS and similar state programs. Wasn't the Act of Congress simply a repeal of a regulation? It was a repeal of a regulation. Okay, so how do I take out of that? I mean, one explanation for it is, I don't think you need a regulation. The law already covers this. How do I tell Congress that the CalSAVERS plan is covered? Well, the regulation specifically addressed CalSAVERS and similar state programs. It would be very strange to repeal it and still mean that those programs are okay. There wouldn't be much point to repealing it. Well, maybe Congress meant us to decide whether they were okay rather than the DOL. It just, it preferred not to have a regulation on this topic at all. I'm not sure I can read into that Congress's approval of a contrary position, but rather simply Congress deciding that it didn't want the regulation to go into effect. It left us with the status quo ante. And so we had to decide under law, without that regulation, what the status of these plans were. Well, I see it differently because congressional intent is to maintain private employee retirement savings as exclusively a federal concern. Well, that's what I'm having trouble getting out of there, out of this. All I can get out of congressional intent was they didn't want this particular regulation to be promulgated. That's easy. And so we don't have that regulation. But I don't think that Congress then tells me how I should interpret the act in the absence of the regulation. How do I get that out of Congress's refusal to approve a regulation? I would point the court to the fact that Congress has twice considered automatic IRA programs nationally. And if Congress has that power, as it does, then we can't have a national program and 50 state programs. I think that would not be functional. I think you're reading a lot into what's either inaction or the rejection of the regulation that doesn't completely answer this. I guess I'd be more curious to know from you why you think that this, that CalSABERS results in the maintaining the plan. Why do you think that? The employer is being required. And I assume you're speaking of the actual California employers. Employers are being required to establish or maintain plans because they have to enroll their employees. They have to determine eligibility and they have to remit the deductions from the paychecks. So is that establishment in your view or maintenance? Sure. I mean, it seems to me, in a common sense fashion, the state of California has established the plans. So I'm more interested in whether or not you think the employers are maintaining the plans by undertaking these actions. Well, I do think the employers are being required to maintain the plans. They've been told to maintain plans. That's what they were told on the CalSABERS website. And there's no one else doing it. They must do it. It's an ongoing administrative scheme whereby they determine the eligibility, they remit the payroll deductions. And if they don't remit those payroll deductions, which has happened in other cases and could happen at any time, the congressional intent there is that those employees have access to the federal courts. Under CalSABERS, they will only have access to the state courts. So this is... Well, you keep telling us that the congressional intent is such, but it's clear that Congress only meant to cover plans established and maintained by an employer. So that's the first question, isn't it? If the plan wasn't established and maintained by an employer, it's not an ERISA plan, is it? The plan does have to be established or maintained by an employer. And there are two ways for that. The CalSABERS program as a whole, it is an ERISA plan as well, because CalSABERS is stepping into the shoes of the employer. CalSABERS is telling the employers, you will do this, or you will pay penalties, or you have to choose a different ERISA plan. But the employer is being... See, that's why I'm having trouble with your established argument. The employer is the subject of a state mandate. It's not like the employer said, gee, I'd love to establish a plan, or took any actions to establish a plan. The state said, here's our plan, employer, and if you meet this categories, you must enroll your employees in it. So that's why I'm having difficulty with established. Maintenance, the question is how much they actually did, but how did they establish the plan, the employers? Well, CalSABERS as a whole is established by the trust, because they're stepping into the shoes. But your question is about the actual employers, how are they establishing plans? Sure, because as I read the intent of ERISA, it was to keep employers from having control over, or undue control over, plans that they'd established for the benefit of employees. And here, the employer is saying, I don't have a plan. The state has a plan, which I'm forced to enroll you in. That just doesn't sound like establishment to me. Well, the mandate does not save anything from CalSABERS. That's clear in Standard Oil, GoBay, and even in the Fort Halifax decision, if you look at pages 7 and 12. The mandate does not save the program in itself. So the fact that it's true, and the state acknowledges that, the question is what are they being mandated to do? And the state says they're being mandated to do something that's very similar to what they do for withholding of taxes for Social Security. It's basically an administrative back-end function. They're not being mandated to establish or maintain a plan. Well, this isn't just a payroll practice. We have to look at the fact that health care plans and pension plans are different. With these pension plans, the money is the employee's own money. It's being taken and sent into an IRA. It's becoming automatically vested retirement funds, which Congress intended to protect. And this is different. If we take a look at this court's case in Golden Gate, the district court's error can be found in the fact that it overlooked the Modsluski decision, said that pension plans are distinct and a totally different category. So they have a different definition under ERISA, and they are to be interpreted differently. Modsluski said they're to be interpreted more broadly. And they also said the employer intent is irrelevant. So employers, whether employers intend to establish a plan or not, doesn't matter. Right, but on these cases, that line of case is really about the creation of the de facto plan by an employer. I mean, here, I think the question is, is there sufficient employer involvement in the first place to come within what ERISA defines as an ERISA plan? That seems very different than the de facto plan case. Well, what we're arguing is that the test in the Golden Gate case is not the right test, because this is a retirement plan case. We really have to look at the 1975 Safe Harbor and the fact that CalSAVERS fails that Safe Harbor. So if this were an insurance plan, your position would be that the employer did not establish it? It's possible, but that's not the case. Well, you tell us there's a difference between insurance. So in the San Francisco case, it was an insurance plan, and it was a, you know, roughly equivalent. There's some differences. But let's assume the state of California started CalObama, its own state insurance plan, and required employers to deduct three percent of everybody's paycheck, as the way Medicare works in the federal system, to pay to the state. Would the plan be established by the employer? I believe the bar would be lower in that circumstance because pension plans are construed more broadly. Well, but I understand they're construed more broadly, but the question I'm asking is, why are they construed more broadly with respect to whether they're established or maintained? I don't find anything in the case law that tells me there's a difference between insurance plans and pension plans with respect to whether they're established or maintained. Tell me where I find that. The difference is that state regulation does occur over things such as health and insurance, but it doesn't occur over pension plans. Pension plans have always been federal, and the 1975 safe harbor is the test for them. But the question here is whether this is an enriched pension plan. So to say it's a pension plan is to sort of assume what we're trying to figure out here, which is, is the level of employer involvement here sufficient enough to make this attributable to the employer under the statute, or is it somehow otherwise in reference to or connected with under some of these other tests that have been used? But to just call it a pension plan, I think, is not to really answer what's the core issue here. Well, it's established or maintained by the employer because it passes the Donovan test. We have the four factors of the Donovan test. Any employee, from their perspective, is going to perceive, oh, my employer set this up, they signed me up, they're deducting my paycheck, they had to automatically enroll me. They're perceiving it as an employment based relationship. This is an employment based relationship. So can I ask, just to understand where you think the line is, I mean, is there, in your view, could the state involve the employer at all? In other words, here there's a couple, we can call them administrative, but I know you may dispute that characterization, there's a couple of duties that the employers have. What if instead of three of those duties, they had one? Is that, is it still an arrested plan in your view? Yes, the state should not be involving employers at all. That is, that is our view. As soon as there's an employment connection in the relationship, that's what the employee will perceive. But if the state were required to, if the state were required to just inform, if the employer were required to inform the state about the number of employees that have been over 18 who would be eligible for CalSAVERS, would that, in your view, establish or maintain an ERISA plan? If an employer is simply telling the state how many employees they have? Yes. No, no. But the state requiring the employers to sign up their employees is, is causing an ERISA plan. Why do you believe that? Can I ask you one question? Why do you believe that a reasonable employee would believe that the employer is establishing this plan when everything about the statute says that the employer has to distance himself from, from that very thing? Because the employer is doing the enrollment and deducting their paycheck. Okay. Isn't that, isn't that true of something like medic, isn't that true of something like Medicare also? I don't, I don't think my employer, well, my employer is the United States, so I guess when I was in private practice, I didn't think my employer had established Medicare because it was deducting from my paycheck to send money to Medicare. Why, why would a reasonable employee think that the employer started something called CALSAVERS? Because we're handling the employee's own money. It becomes vested immediately when it goes into the IRA. And the separate definition of a pension plan in ERISA says that the program results in a deferral of income by employees. And that's exactly what this is doing. It doesn't make any difference that the state is stepping into the shoes of the employer, that the plans are happening anyway. Judge Corker, I may have spoken over you before. Did you, did I cut you off? You were, you were, you were going where I was going. That's perfect. Uh, you wanted to save some time for rebuttal. And as usual, we've used up most of it. We will give you some time for rebuttal. Okay. Thank you, your honors. Mr. Grady. Thank you, your honor. Um, good morning. I'm Cheryl Grady, deputy attorney general for, uh, defendants and affidavits. And could you either speak a bit louder or get closer to your mic if you would? Sorry. Is this, is this better? That is better. Okay. Um, I think that your honor's question is focused on the critical issue, which is ERISA is not concerned with benefits per se. It is concerned with employee benefit plans. And, and those plans have to be established or maintained by an employer. Um, the, the, this court's decision in Golden Gate restaurant association versus city and county of San Francisco made clear what other court, uh, other cases have said before, which is where an employer does not exercise more than a modicum of discretion, there is not a plan under ERISA. And here I have to correct a misstatement that, um, counsel has made here. The, the way the CalSAVERS is structured is the employers provide CalSAVERS with the contact information for their eligible employees, which is every employee over the age of 18, and then CalSAVERS, not the employer enrolls them in the plan, provides them with all the plan documentation, determines whether they opt out, whether they change their, their contribution rate from the default rate. And then they simply, through their website, instruct the employers on which employees have deductions that should be coming from their paycheck and the percentage amount of the deduction. That's, I was going to ask you a question about that. The amount is calculated by the state program, not by the employer? It's, it is not, uh, it is, the state program sets a default, not the employer. So the state program says take out 1%, say, and then the employer has to figure out what 1% of that employee's paycheck is, right? Right. They, right. Well, the state sets a default rate. The employee can actually, employee, not the employer, can actually change that. Right. But I'm, I'm looking at the default mechanism right now. Right. The default mechanism is, I believe it's 5%. The state provides the employer with a list of employees and says, take out 5% for each of these employees. And the employee, employer has to calculate what the 5% is. Right. Simple, right. Simple multiplication. But if an employer has an emissive plan, are they obligated to tell the state that, or can they basically say, well, we know we're not eligible. And so we can just go about our business. They, I think that there is the requirement. That's a good question. There, they, they need to nothing more than to tell the state that they are exempt. Um, and, um, so they, they, they, if they, if they don't, um, explain to the court that they're exempt under some fashion with an ERISA plan or another tax qualified plan, then sooner or later, the state is going to ask them, you know, why haven't they provided contact information? I believe that that is the way it works. Is there a, a, a plaintiff in this case does not maintain an ERISA plan, but are there any situations where somebody, where an employer would have an ERISA plan, but would nonetheless be subject to CalSAVERS? I, I think that there might be some bizarre circumstance, possible potential where an employer could have an ERISA plan that, you know, didn't qualify for tax, favorable tax treatment, that, so that hypothetically, although it would be extremely unlikely, they would have to comply with CalSAVERS, but they would not be subject to CalSAVERS. Have to change their plan in any way. Um, and, and in Golden Gate, some of the employers who actually had to remit money, um, to the city under that plan actually had ERISA plans, but they just didn't have actual coverage. I'm not aware that there are any ERISA plans that wouldn't be exempt. Um, but there is a, because CalSAVERS is measured based on tax qualifications, hypothetically, that might be true. We don't have a plaintiff in this case in that situation, but if we did, if we had a plaintiff with an ERISA plan that was not tax exempt for some reason, and also could that employer complain about being required, employees complain about being required to also be in CalSAVERS? I don't believe so. I mean, they're not really in CalSAVERS. They're providing contact information and deducting from their employees. Salary as, you know, requested, as instructed by the state. It would be no different than in the Golden Gate situation where some of the employers who actually had ERISA plans also had to pay money to the state under the program because their ERISA plan didn't provide adequate coverage, at least hypothetically. Can you, can you address, can you address the congressional history for me? I'm, I'm having some trouble. I know we have a safe harbor that was enacted and then we have a subsequent regulation that was meant specifically to cover these plans that Congress repealed. So go back to the original safe harbor and tell me why, tell me why you think CalSAVERS qualifies for that safe harbor. I'm not sure it does. And that's why I'm asking. Well, you actually don't get to the safe harbor unless you find that there is a plan. Right now, I'm, that was going to be my next question. My first question is, if CalSAVERS qualifies under the safe harbor, we're done. I'm concerned that it doesn't because this is a mandatory plan. So tell me why you think it does. If, if the safe harbor applies, I believe it does because it is not a mandatory plan. It is, there, the safe harbor has a number of requirements, but the only one I'd issue here is whether the participation by the employees is completely voluntary. Well, what do I do with, what do I do with quals under that circumstance? Or do I, like your opponent say, well, that's an insurance case. I'm sorry. What case were you referring to? What do I do with quals, which says the fact that you can opt out of a plan doesn't make it voluntary. I think it, it, it depends on, on the circumstances of the case, but that was not an effect. There's no ERISA case that is held that an auto deduct plan with an opt out provision is not completely voluntary. And in fact, after the safe harbor was enacted in 1999, the Department of Labor issued an interpretive bulletin that clarified, and we addressed it in our brief, but the only reference it had to completely voluntary, that interpretive bulletin of their own regulation was that the materials given to the employee to make clear their participation was completely voluntary. And here, we actually have about a third of the eligible employees opt not to save through CalSAVERS. There's no, what was that number, counsel? I, I want to, it's about 30 percent, 30, 3-0, right. They can opt out through a phone call, going on the website, or sending in a form. It's very simple. The materials make it so that they can opt out. And, and they do. And even, even in this time of pandemic, there is a pretty good participation rate, but there's a significant number of employees who elect not to participate. So there's nothing intuitive about translating completely voluntary into self-evident, and there is no history. None of the pronouncements by DOL have addressed that issue until they came to the 2016 regulation, which has now been repealed. And, and even in that case, they, they note that they're enacting the safe harbor to prevent the risk that the programs might be preempted if they were challenged. So, so there, so I think you have to read this 1975 safe harbor in its common sense interpretation, which is, is this, you know, under the circumstances, is this a completely voluntary plan? Okay, I assume, I assume, I understand your argument is that we don't get to the safe harbor unless the plan was maintained and established. What, what do we do with the regulation repealed by Congress? What, I mean, it seems pretty clear to me when I, when I look at what happened there, the insurance industry lobbied Congress and the states lobbied Congress and the insurance industry won. Now, I'm not sure I can, I'm not sure I can say that as a matter of law, but it looks to me that's what, what happened. Uh, was that a victory of PERIC? Uh, if, if, if the insurance companies did that, yes, I think it is a PERIC victory. All the Congressional Review Act did was repeal the regulation. It did not amend ERISA and there's nothing in the legislation that indicates their motive. As I think you suggested, your honor, they could have simply said, you don't need a regulation for this because ERISA governs employee, employer plans, not state programs. So I don't think you can take any more from the Congressional Review Act than the obvious, which is that they took away the safe harbor provision that obviously would have perhaps eliminated the need for this lawsuit. Um, but it, it wasn't an amendment of ERISA and fundamentally, uh, the CalSAVERS program is a state program, not an employer program. And it is not a plan, um, that is maintained or established by any employer. How do you, um, how do you address the point that was made by the other side that the statute is essentially, the CalSAVERS is essentially ERISA regarding. In other words, it, it sort of, in its operation, it does depend on whether the on the appellant's view that, that creates a preemption issue. Um, that, that's simply not the, the test or related to or, or in connected to preemption. I mean, the reference test is whether the act immediately and directly on an ERISA plan. It doesn't act on any ERISA plan or whether the existence of an ERISA plan is essential to the law's operation. You could have CalSAVERS without having a single ERISA, uh, plan involved. Um, and, and, and connected to is even a harder standard for them because it has to, uh, affect administration of ERISA plans and nothing in the statute affects in any way the administration of ERISA plans. Nothing tells employers what they need to offer. In fact, or how, how to determine their beneficiaries or how to structure it. It is, it is a completely separate state run program that has nothing to do with any ERISA plan. I thought the question was really the existence of the ERISA plan triggers the operation of CalSAVERS or not non-existence of the ERISA plan triggers the operation of CalSAVERS. Well, it's, it's really, um, again, it isn't measured by ERISA. It's measured by whether there is a tax qualified plan. Um, and if there's a tax qualified plan, it's true. You do not have to comply with, um, you don't have to send your list of employees to the program because they already have a vehicle for retirement savings, but that does not affect any ERISA plan. And the fact that ERISA provides potential exemption, uh, doesn't change that. If an employee, um, somebody who has their money in CalSAVERS believes that CalSAVERS has done something wrong, you know, mismanagement or, or some other malfeasance, what is their remedy? Well, they have remedies under state law for breach of military duty, if that's appropriate. The plan trustee is a census. They've got a fiduciary duty as the trustee. The board of CalSAVERS, um, has fiduciary duties. So, um, there, there, an employee is not left, it is, it is an, uh, it is an individual retirement account program and the same laws that govern problems that might arise in the applies here. So they have, it is, it is an IRA program and it is treated like any other IRA. Have there been such cases that you're aware of? Has anyone claimed that CalSAVERS has mismanaged their funds? I'm, well, I'm not aware of, um, I, I, I am not aware that there is any situation like that and I would be surprised if they are. The default is very conservative. It's the Roth IRA, um, and, uh, there are, there's a menu of, of investments, but I believe the default, uh, investment principle, uh, investment is geared toward the date of retirement, which is very common in, um, IRA programs. It is professionally managed and I am not aware that there has been any, uh, complaint of any problems. It would have the same recourse as they would have if they open an IRA with, um, a bank and the money is always there so they can withdraw their funds. Counsel, thank you. Um, and we're going to put a minute up on the board for rebuttal. Thank you, your honor. You're muted. You're still muted. Thank you. There we go. Thank you. Thank you very much. Um, I'd like to explain quickly that ERISA must supersede the mandate because in the 1999 interpretive bulletin, it is very clear that employers may select their own IRA sponsor. They may set criteria and in setting criteria, they might have zero IRA sponsors. That might be their choice. So for that to remain effective, CalSAVERS cannot be telling employers, you will choose our IRA program. So this is, this is a huge problem that I hope the court can address. Secondly, I want to say that the court is exactly right about the completely voluntary cases. It can find several more in footnote 12 of 80 Federal Register 72006. Again, that's footnote 12. There are many cases explaining that automatic is not compatible with opting out. Repealing the regulation means that the Department of Labor can never make that regulation again unless Congress says so. And if I see I'm going over time, but I just like to say that a nonemployment relationship would only be if I go into my bank and initiate the process of setting up an IRA. That's a nonemployment relationship. Thank you, counsel. I thank both counsel for their briefing and arguments in this very interesting case. The case will be submitted and with that, we will be in recess. Thank you, Your Honors.
judges: Hurwitz, Bress, Corker